[Crim. No. 19360. Second Dist., Div. Four. Aug. 19, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBIN ALVIN WILLIAMS, Defendant and Appellant.

**COUNSEL**

Clifford Douglas, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Alan V. Hager, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KINGSLEY, J.**—Defendant and Ernest Melvin Wilkerson were jointly charged with two counts of burglary, in violation of section 459 of the Penal Code, and with two counts of arson, in violation of section 448a of the Penal Code. The information was later amended to allege a prior felony conviction against defendant (Health & Saf. Code, § 11910). One count of burglary and one count of arson were later dismissed.

Defendant's motion pursuant to Penal Code section 995 was denied; he pled not guilty. The jury found defendant guilty of burglary as charged in count I of the information (determined to be second degree), and guilty of arson as charged in count III of the information.[1]

Defendant's motions for a new trial and probation were denied. He was sentenced to state prison for the term prescribed by law on both counts, the sentences to run concurrently. He has appealed. We vacate the sentence on the burglary count and affirm the judgment on the arson count.

On the evening of September 14, 1969, Clarence Johns was employed as a custodian at Carver Junior High School in Los Angeles. Part of his duties included locking the administration building and the auditorium building at the school. When the buildings and main gate were locked (by 6 p.m.) Mr. Johns noticed that the school property was in good condition and to his knowledge there were no metal cans containing combustible material. Mr. Johns testified that he never gave defendant or any other persons permission to enter the buildings after he left on the evening of September 14.[2]

Testimony at trial indicated that defendants Rubin Williams and Ernest Wilkerson, together with Pamela Erwing, Clarence Thomas, Jr., and Roosevelt Jones, had been at a party at the residence of Sherri Williams on the evening of September 14, 1969, and the early morning hours of September 15, 1969. Pamela Erwing testified that she and the men left the party in the early morning of September 15 and as they were driving near Carver Junior High School she saw smoke or fire coming from the direction of the school. At this point Ernest Wilkerson stopped the car and there was some conversation about mugging or robbing a pedestrian. Ernest and defendant exited the car, were gone about one minute, and returned to the car. Pamela testified that she did not see any cans taken from the car, nor did she see the trunk of the car opened at that time. The prosecution impeached Pamela

---

[1]Apparently there was no disposition of the prior felony conviction as there is no indication that defendant was ever arraigned on that matter.

[2]The only persons who could enter the buildings would be someone with a key, for example, a school teacher.

through a statement previously given to the police at variance with her trial testimony. Pamela indicated that she had not read the statement before she signed it and that her testimony in court was the truth.

At the trial Clarence Thomas, Jr., gave conflicting testimony. He first testified that, although he was in the car with defendant and the others, he did not participate in setting the fires. He was impeached by the prosecution's use of statements made by Clarence to the police that he, Roosevelt Jones, Ernest Wilkerson, and defendant had broken into Carver Junior High School, poured gasoline in the building and lit the gasoline with torches. At trial, Mr. Thomas at first testified that his statements to the police were untrue, and then changed his testimony to conform to the version given to the police. In addition, he stated that the gasoline was taken from the trunk of Ernest's car, as were the torches. However, he steadfastly maintained that he had seen smoke coming from Carver Junior High School before he and his companions arrived there.

Roosevelt Jones, called by the prosecution, stated that he had been at the same party as defendant and that he left with Pamela, Ernest, Clarence, and defendant. He further testified that he helped take cans containing gasoline from the trunk of Ernest's car, that defendant gained access to the school by breaking a window, and that they all poured gasoline inside the building and set both it and the auditorium on fire.

Cheryl Williams (the person whose party defendant attended) testified that she saw smoke coming from the direction of Carver Junior High School prior to the time defendant and his companions were ready to leave. She gave the approximate time as 2:30 a.m.

Codefendant Ernest Wilkerson testified that he did not leave the party until 2:30 a.m., and that prior to that time Cheryl had pointed out smoke coming from the direction of Carver Junior High School. He denied having the gas cans, entering the school grounds, or setting the fires. He stated that he and defendant stopped near the school for purposes of mugging a pedestrian, but when they saw police and firemen they changed their minds.

Defendant testified in his own behalf that before leaving the party he saw smoke coming from the direction of the Carver Junior High. He confirmed the story of Ernest Wilkerson as to the possible mugging. However, he denied having anything to do with the fires.

Robert Lee Criswell testified that he was driving near Carver Junior High School between 1:45 a.m. and 2 a.m. on September 15 and that he saw

smoke coming from the school. He watched two people run to and over the fence surrounding the school and get into a car containing two people in the back seat. The car appeared to have the license number OSC 906. He described the persons entering the car as two young males in their twenties, standing approximately 5'7" and 5'9" in height. It was later stipulated that an automobile with license number OSC 906 was registered to Kenneth Rucker Wilkerson and that Ernest Wilkerson drives it most of the time.

Leslie Lewis, a fireman for the Los Angeles City Fire Department, testified that, on September 15th, he investigated the fire at Carver Junior High School. He concluded that two major fires had been set by hand. He smelled a heavy gasoline odor in the burned structures, several five-gallon containers, newspapers rolled up in the form of torches, and burn patterns on the floors which were caused by flammable liquid. He concluded that the fires had been set by human hands and that it would have taken between 15 and 30 minutes for one person to start the fires and between 10 and 20 minutes for two persons to start the fires.

Sergeant Raymond Callahan of the Los Angeles Police Department went to Carver Junior High School on the morning of September 15 to investigate the fire. He testified that on some of the doors in the Carver building he found marks which indicated to him that the doors had been pried open with an instrument. Near the northeast corner of the Carver building he found footprints in the soft dirt.

Donald Hale, a criminalist for the Los Angeles Police Department, testified that certain footprints near the fence surrounding the school could have been made by defendant's shoes, and further, that a screwdriver found in Ernest Wilkerson's car probably had made the marks found on the forced door of the Carver building.

Officer Daniel P. Mahoney, a Los Angeles police officer, testified that he talked with Cheryl Williams on September 15 at which time she stated that defendant and the other car occupants left her house at approximately 1:30 a.m. She did not know the exact time because she did not have a watch.

Dr. Andrew Anderson, principal of Carver Junior High School, testified that when he arrived at the school on September 15, he found that the Carver building and the auditorium building had suffered severe fire damage. In addition to structural damage, all student records were destroyed. It was estimated that the total damage amounted to $70,000 to $80,000.

## I

Defendant contends, and the Attorney General agrees, that the dictates of Penal Code section 654 were violated when defendant was sentenced to state prison on counts of both arson and burglary.[3] As the punishment prescribed for arson is greater than that for second degree burglary, the latter sentence must be set aside.

## II

Pursuant to Penal Code section 448a, the court defined arson as follows: "Every person who willfully and maliciously sets fire to or burns any building is guilty of the crime of arson."

Defendant assigns as error the trial court's failure to instruct the jury on the meaning of the word "maliciously," according to Penal Code section 7, subdivision 4. That section provides: "The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law; . . ."

A similar contention was raised and rejected in *People* v. *Bowman* (1966) 240 Cal.App.2d 358 [49 Cal.Rptr. 772]. In that case defendant offered instructions on the meaning of the words "willfully" and "maliciously" as used in the definition of arson.[4] The reviewing court conceded that the statutory definition of arson required that the act of setting fire to or burning be done maliciously. However, as related to the crime of arson, the court noted that the word "malice" denotes nothing more than a deliberate and intentional firing of a building (or other such structure) as contrasted with an accidental or unintentional ignition. (*People* v. *Bowman* (1966) *supra,* 240 Cal.App.2d 358, 387; *People* v. *Andrews* (1965) 234 Cal.App.2d 69, 75 [44 Cal.Rptr. 94].)

The corpus delicti of arson is sufficiently proven where the evidence shows beyond a reasonable doubt that the fire was of incendiary origin. (*People* v. *Andrews* (1965) *supra,* 234 Cal.App.2d 69, 76.) No evidence was presented from which the jury could legitimately infer that

---

[3]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under one bars prosecution for the same act or omission under any other."

[4]Although in *People* v. *Bowman* defendant's conviction was based on Penal Code section 447a rather than 448a, this distinction is immaterial as both sections define arson in the same manner, except that 447a refers to arson of a dwelling house while 448a refers to arson of other types of buildings.

the fire resulted from accidental ignition. The testimony of the custodian and the principal, as well as the presence of gasoline cans, impells a contrary finding.

Noting that an instruction on intent was given, the court in *People* v. *Bowman, supra,* at page 387, concluded that the jury must necessarily have understood that arson involved an intentional and deliberate firing of a building. In the present case the court gave instructions on both intent and wilfullness, thus presenting an even stronger case than *People* v. *Bowman.* There was no error.

## III

Defendant next urges that the admission into evidence of statements made by codefendant Ernest Wilkerson to Officer Mahoney, violated *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and that the court's failure to instruct on limited admissibility violated *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].

Outside the presence of the jury, testimony of Officer Mahoney, the arresting officer, indicated that, following the fire at Carver Junior High School, a Mr. Criswell obtained the license number of a car leaving the scene. The police department ran a check on the vehicle, and as a result of this check Officer Mahoney went to a residence at 743 East 94th Street. The men leaving the scene were described as Negro males in their late twenties. While conducting his investigation at the above address, Officer Mahoney encountered defendant and codefendant approaching the residence in the vehicle in question. Officer Mahoney asked Ernest Wilkerson where he had been the previous evening. Mr. Wilkerson stated that he was at his girl friend's house with defendant until 5 a.m. Ernest Wilkerson was then asked whether he was in the vicinity of Carver Junior High School in the early morning hours. He replied that he had transmission trouble and parked in front of the school. At this time Officer Mahoney arrested defendant and Ernest Wilkerson and advised them of their *Miranda* rights. Both stated they wished to waive their rights.

Defendant first contends that at the time Officer Mahoney encountered defendant and Ernest Wilkerson the accusatory stage had been reached. Defendant reaches this conclusion by alleging that the investigation had ceased to be a general inquiry into an unsolved crime and had begun to focus on defendant (*People* v. *Dorado* (1965) 62 Cal.2d 338 [42

Cal.Rptr. 169, 398 P.2d 361]; *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758].) Defendant has standing to challenge the admissibility of statements of a codefendant. *(People* v. *Aranda* (1965) *supra,* 63 Cal.2d 518.)

The case of *People* v. *Davis* (1965) 235 Cal.App.2d 214 [45 Cal.Rptr. 297] (decided after *Dorado* and *Escobedo)* is directly in point. In that case a car was observed driving from the scene of a murder. Police officers spotted the car at defendant's residence and asked defendant about his activities on the previous evening. In concluding that the admission of defendant's statements to police officers did not violate his constitutional rights pursuant to *Escobedo* v. *Illinois, supra,* the court stated that the police had justification for their interview with defendant and that suspicion had not yet focused on him as the prime suspect. Similarly, Officer Mahoney's questioning of Ernest Wilkerson was not accusatory nor asked for the purpose of eliciting a confession or obtaining admissions. In conducting his investigation, Officer Mahoney was entitled to ascertain whether the car had been at Carver Junior High and, if so, the occupants of the car. It was only after Wilkerson's response that Officer Mahoney had reason to believe that defendant and Wilkerson were prime suspects. At this point, both defendant and Wilkerson were informed of their *Miranda* rights. Therefore, the *Escobedo* situation is not present as defendants were not in custody, were not prime suspects during the initial inquiry, and were not asked questions for the purpose of eliciting a confession. *(People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338, 354 [as to when *Escobedo* applies]; *People* v. *Oster* (1968) 260 Cal.App.2d 539, 544 [67 Cal.Rptr. 361]; *People* v. *Davis* (1965) *supra,* 235 Cal.App.2d 214, 226.)

Thus, there was no error in admitting Wilkerson's statements into evidence, as the accusatory stage had not yet been reached.

■ Defendant next urges prejudicial error in the trial court's failure to instruct the jury that the statements were to be used only against Wilkerson. While there may have been error in the court's failure to so instruct, any such error was not prejudicial. At the police station, after defendant had been informed of his *Miranda* rights, defendant agreed with Wilkerson's story and then elaborated on it. This statement was elicited through testimony of Officer Mahoney and no objection was made at the trial. It is thus difficult to see how any prejudice occurred.

## IV

■ Clarence Thomas, Jr., an accomplice in the commission of the burglary and arson at Carver Junior High, testified in behalf of the prosecution. He was asked by counsel for the People if a juvenile court petition

(filed against him regarding the Carver fire) had been sustained. After an affirmative answer by Mr. Thomas, both defendants moved for a mistrial. That motion was denied and the trial court declined to give an admonition so as not to unduly emphasize the matter. Defendant contends that the admission of this testimony constituted prejudicial error by indicating to the jury that an accomplice had already been found guilty of the alleged crimes.

Ordinarily it is improper to bolster the credibility of "ordinary" witnesses until there is some indication that their testimony is suspect. Such an indication will generally appear on cross-examination. However, if there is no cross-examination, the need does not arise, and the credibility of the witness is evaluated by the jury.

In contrast, judicial interpretation of Penal Code section 1111 indicates in the first instance that the testimony of an accomplice is to be viewed with distrust. Testimony given by an accomplice is subject to the statutory requirement of corroboration. (Pen. Code, § 1111.) ▮ The necessity of corroboration is based primarily on experience which has shown that evidence given by an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope of immunity from prosecution or leniency. (*People* v. *Robinson* (1954) 43 Cal.2d 132, 141 [271 P.2d 865]; *People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734]; *People* v. *Chrisman* (1967) 256 Cal.App.2d 425, 438 [64 Cal.Rptr. 733].)

▮ Consequently, where the accomplice is called as a witness by the prosecution, the trial court is required to give an instruction that testimony of the accomplice should be viewed with caution. (*People* v. *Gonzales* (1970) 4 Cal.App.3d 593, 607 [84 Cal.Rptr. 863]; *People* v. *Cuellar* (1968) 262 Cal.App.2d 766, 770 [68 Cal.Rptr. 846].) ▮ The jury was so instructed and was also told that Clarence Thomas, Jr., was an accomplice as a matter of law and that his testimony required corroboration.

It is thus obvious that Mr. Thomas was not an "ordinary" witness. As an accomplice, he was subject to a presumption that his testimony would be viewed with caution.

Even though the rationale for the rule of corroboration may not have been fully applicable to the facts of this case (as the testimony could not have been given in the hope of immunity), the cautionary instruction was nevertheless required. It was entirely possible that the defense would not cross-examine Mr. Thomas and that the People would therefore be unable on redirect to dispel the effect of the required instruction. Consequently,

the People referred to the juvenile court petition in order to lend credence to the initially suspect testimony of Mr. Thomas by showing he had nothing to gain, except a desire to tell the truth.

Under these circumstances, there was no error.

The sentence on the burglary count (count I) is vacated; the judgment on the arson count (count III) is affirmed.

Jefferson, Acting P. J., and Dunn, J., concurred.